## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MELVYN KLEIN, Individually and On Behalf of All Others Similarly Situated, | Case No.: |
| Plaintiff, | |
| vs. | **JURY DEMANDED** |
| BIOCRYST PHARMACEUTICALS, INC., GEORGE B. ABERCROMBIE, STANLEY C. ERCK, JON P. STONEHOUSE, NANCY J. HUTSON, SANJ K. PATEL, ROBERT A. INGRAM, FRED E. COHEN, KENNETH B. LEE, JR., IDERA PHARMACEUTICALS, INC., NAUTILUS HOLDCO, INC., ISLAND MERGER SUB, INC., and BOAT MERGER SUB, INC., | |
| Defendants. | |

Plaintiff Melvyn Klein ("Plaintiff"), by his undersigned attorneys, alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     Plaintiff brings this action, individually, as a public stockholder of BioCryst Pharmaceuticals, Inc. ("BCRX" or the "Company") against the members of BCRX's Board of Directors (the "Board" or the "Individual Defendants") and BCRX for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), and Rule 14a-9 promulgated thereunder ("Rule 14a-9"), and on behalf of himself and a putative class of public shareholders of BCRX against the Individual Defendants (defined below) for breach of fiduciary duty.

2.      On January 21, 2018, BCRX, Idera Pharmaceuticals, Inc. ("IDRA"), Nautilus Holdco, Inc., a direct, wholly owned subsidiary of BCRX ("Holdco"), Island Merger Sub, Inc., a direct, wholly owned subsidiary of Holdco ("Merger Sub A"), and Boat Merger Sub, Inc., a direct, wholly owned subsidiary of Holdco ("Merger Sub B"), entered into an Agreement and Plan of Merger (the "Merger Agreement").  Pursuant to the Merger Agreement, and subject to the satisfaction or waiver of the conditions specified therein, (a) Merger Sub A shall be merged with and into IDRA (the "IDRA Merger"), with IDRA surviving as a wholly owned subsidiary of Holdco, and (b) Merger Sub B shall be merged with and into BCRX (the "BCRX Merger", and, together with the IDRA Merger, the "Proposed Mergers"), with BCRX surviving as a wholly owned subsidiary of Holdco.  Holdco will be renamed prior to the closing of the Mergers.

3.      At the effective time of the Mergers (the "Effective Time"), (i) each share of common stock, par value $0.01 per share, of BCRX ("BCRX Common Stock") issued and outstanding immediately prior to the Effective Time (other than the shares that are owned by BCRX, IDRA, Holdco, Merger Sub A or Merger Sub B or any wholly owned subsidiary of BCRX, IDRA, Holdco, Merger Sub A or Merger Sub B) will be converted into the right to receive 0.50 (the "BCRX Exchange Ratio") of a newly issued share of common stock (the "Holdco Common Stock"), par value $0.01 per share, of Holdco (the "BCRX Merger Consideration").  No fractional shares of Holdco Common Stock will be issued in the Mergers, and BCRX stockholders will receive cash in lieu of fractional shares as part of the BCRX Merger Consideration, as specified in the Merger Agreement.

4.      Following the Effective Time, BCRX common stockholders will own approximately 51.6% of the shares of Holdco Common Stock on a fully diluted basis, and IDRA common stockholders will own 48.4%.

5.      Also at the Effective Time, outstanding options to purchase shares of BCRX Common Stock (the "BCRX Options") will accelerate and vest in full and be assumed by Holdco and converted into stock options to purchase shares of Holdco Common Stock (each, a "Holdco Option") with the same terms and conditions (other than vesting) as applied to the BCRX Options immediately prior to the Effective Time; however, each such Holdco Option will cover a number of shares of Holdco Common Stock equal to the product of the number of shares of BCRX Common Stock subject to the BCRX Option and the BCRX Exchange Ratio and will have an exercise price per share equal to the amount obtained by dividing the per share exercise price of the BCRX Option by the BCRX Exchange Ratio.   All BCRX restricted stock units covering BCRX Common Stock ("BCRX RSUs") will accelerate and vest in full and be converted into restricted stock units covering Holdco Common Stock ("Holdco RSUs") with the same terms and conditions (other than vesting) as applied to the BCRX RSUs immediately prior to the Effective Time; however, the Holdco RSUs will cover a number of shares of Holdco Common Stock equal to the product of the number of shares of BCRX Common Stock subject to the BCRX RSU and the BCRX Exchange Ratio.

6.      Also at the Effective Time, outstanding options to purchase shares of IDRA Common Stock (the "IDRA Options") and outstanding warrants and pre-funded warrants to purchase shares of IDRA Common Stock ("IDRA Warrants") will be assumed by Holdco and, if the IDRA Options are held by individuals who are not a party to certain severance and change of control agreements, such options shall accelerate and vest in full.  Each IDRA Option will be converted into a Holdco Option with the same terms and conditions (other than, in the case described above, vesting) as applied to the option immediately prior to the Effective Time; however, the Holdco Option will cover a number of shares of Holdco Common Stock equal to

the product of the number of shares of IDRA Common Stock subject to the IDRA Option and the IDRA Exchange Ratio and will have an exercise price per share equal to the amount obtained by dividing the per share exercise price of the IDRA Option by the IDRA Exchange Ratio.  All IDRA Warrants will be converted into a warrant to acquire Holdco Common Stock ("Holdco Warrant") with the same terms and conditions as applied to the warrant immediately prior to the Effective Time; however, the Holdco Warrant will cover a number of shares of Holdco Common Stock equal to the product of the number of shares of IDRA Common Stock subject to the IDRA Warrant and the IDRA Exchange Ratio and will have an exercise price per share equal to the amount obtained by dividing the per share exercise price of the IDRA Option by the IDRA Exchange Ratio.

7.      On February 27, 2018, Defendants filed a Form S-4 Registration Statement (the "Registration Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Mergers.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

9.      This Court has jurisdiction over Defendants because each defendant is either a corporation that conducts business in and maintains operations within this District or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place,

where most of the documents are electronically stored, and where the evidence exists.  BCRX is incorporated in this District.

## THE PARTIES

11.     *Plaintiff Melvyn Klein* is, and has been at all times relevant hereto, a stockholder of BCRX.  *See* attached certification.

12.     *Defendant BCRX* is incorporated in Delaware and designs, optimizes and develops novel small molecule drugs that block key enzymes involved in the pathogenesis of diseases.

13.     *Defendant George B. Abercrombie* ("Abercrombie") was appointed to the Board in October 2011 and was elected Chairman of the Board in May 2013.

14.     *Defendant Stanley C. Erck* ("Erck") was appointed to the Board in December 2008.

15.     *Defendant Jon P. Stonehouse* ("Stonehouse") joined the Company in January 2007 as Chief Executive Officer ("CEO") and Director.  He was also named President in July 2007.

16.     *Defendant Nancy J. Hutson* ("Hutson") was appointed to the Board in January 2012.

17.     *Defendant Sanj K. Patel* ("Patel") was appointed to the Board in September 2015.

18.     *Defendant Robert A. Ingram* ("Ingram") was appointed to the Board in August 2015.

19.     *Defendant Fred E. Cohen* ("Cohen") was appointed to the Board in July 2013.

20.     *Defendant Kenneth B. Lee, Jr.* ("Lee") was appointed to the Board in June 2011.

21.     Defendants identified in paragraphs 13 through 20 are collectively referred to herein as the "Individual Defendants."

22.     **Defendant IDRA**, is a Delaware corporation that focusses on the discovery, development and commercialization of novel oligonucleotide therapeutics for oncology and rare diseases.

23.     **Defendant Nautilus Holdco, Inc.** ("Holdco") is a Delaware corporation and a direct wholly owned subsidiary of BCRX.

24.     **Defendant Island Merger Sub, Inc**. ("Merger Sub A") is a Delaware corporation and a direct wholly owned subsidiary of Holdco.

25.     **Defendant Boat Merger Sub, Inc.** ("Merger Sub B") is a Delaware corporation and a direct wholly owned subsidiary of Holdco.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings his claim as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own BCRX common stock (the "Class").  Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

27.     Plaintiff's claim is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

28.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of March 28, 2017, there were approximately 80,378,064 shares of Company common stock issued

and outstanding. All members of the Class may be identified from records maintained by BCRX or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

29. Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, among inter alia:

(a) Is the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct;

(b) Whether Defendants have disclosed and will disclose all material facts about the Proposed Mergers to BCRX shareholders;

(c) Have the Individual Defendants breached their fiduciary duties of loyalty and/or care with respect to Plaintiff and the other members of the Class in connection with the Merger; and

(d) Whether Plaintiff and the other members of the Class would be irreparably harmed were the mergers complained of herein consummated.

30. Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

31. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

32. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## BACKGROUND

33.    In early March 2016, Defendant Stonehouse telephoned the chief executive officer of a privately held biopharmaceutical company ("Company A") to discuss developments in the biopharmaceutical industry generally.  On the call, each expressed their mutual interest in learning more about the other company's clinical development programs, and the two agreed to meet in person later that month.

34.    Following the call, on March 11, 2016, Company A and BCRX entered into a non-disclosure agreement.

35.    Beginning in mid-March 2016 and continuing through April 2016, Company A and BCRX conducted due diligence on each other.

36.    On March 29, 2016, Defendant Stonehouse and three (3) directors of BCRX met with the chief executive officer and senior management of Company A.  At that meeting, they discussed whether to explore a potential business combination that would be structured as a stock-for-stock transaction based on the relative values of the two companies.  Representatives of BCRX and Company A also discussed their respective views on the values of BCRX and Company A.

37.    Over the next several weeks diligence was conducted by both companies.  In late April 2016, the chief executive officer of Company A called Defendant Stonehouse and informed him that Company A was not interested in pursuing a business combination transaction at that time because Company A's due diligence review of BCRX, given the lack of clinical data on BCX-7353, did not support the relative valuation levels previously discussed by representatives of Company A and BCRX.

38.     On May 24, 2016, the BCRX Board held a regularly scheduled meeting, which was also attended by members of BCRX management and representatives of an advisor engaged by BCRX to assist in identifying potential strategic opportunities.

39.     On June 10, 2016, Defendant Stonehouse called the chief executive officer of another biopharmaceutical company ("Company B") who expressed interest in discussing their respective businesses.  Following this call, Defendant Stonehouse and the chief executive officer of Company B agreed to meet in person to discuss potential opportunities for a strategic transaction between the two companies.  Defendant Stonehouse and the chief executive officer of Company B met on June 22, 2016 and on July 26, 2016 and discussed a transaction proposed by the chief executive officer of Company B in which Company B would acquire BCRX for cash.

40.     On July 27, 2016, BCRX and Company B entered into a non-disclosure agreement, which included a standstill provision.

41.     In early August 2016, the chief executive officer of Company B called Defendant Stonehouse and told him that Company B was no longer interested in pursuing a transaction with BCRX because, based on the advice of Company B's financial advisor, Company B believed it would need to provide a meaningful premium to BCRX stockholders to successfully conclude a deal, and Company B was not willing to pay a price for BCRX that provided a meaningful premium to BCRX stockholders based on the trading price of BCRX common stock at the time.

42.     On August 5, 2016, the BCRX Board held a special telephonic meeting.  At the meeting, Defendant Stonehouse informed the BCRX Board of Company B's decision to terminate discussions at that time.  The BCRX Board also discussed whether to explore other potential sale transactions, and the BCRX Board's belief that other potential purchasers were not likely to appropriately value BCRX until more data was available from clinical trials.

43.     As a follow up to an informal meeting at an investor conference in June 2016, Defendant Stonehouse and Mr. Milano, chief executive officer of IDRA, spoke by telephone in July 2016 and discussed developments in the biopharmaceutical industry generally and their mutual interest in learning more about the clinical and discovery programs of each other's company. Mr. Milano and Defendant Stonehouse met in person in August 2016 and discussed their respective companies, whether a combination of the two companies could enhance stockholder value for each respective company, and whether to explore a potential business combination at that time.

44.     The BCRX Board held a regularly scheduled meeting on September 27 and 28, 2016, and conducted its annual strategic review which included an update from BCRX management on developments in BCRX's clinical programs and a discussion of potential strategic combination opportunities.

45.     On October 27, 2016, as a follow up to the discussions between Defendant Stonehouse and Mr. Milano during the summer of 2016, Defendant Stonehouse and Lynne Powell, Senior Vice President and Chief Commercial Officer of BCRX, met with Mr. Milano and Clayton Fletcher, Senior Vice President of Business Development and Strategic Planning of IDRA, and discussed their respective company's clinical development and preclinical programs.

46.     In December 2016, the chief executive officer of a privately held biopharmaceutical company ("Company C") called Defendant Stonehouse and expressed an interest in exploring a possible strategic transaction with BCRX.

47.     On December 22, 2016, BCRX and Company C entered into a non-disclosure agreement. Defendant Stonehouse and members of BCRX management met with members of Company C management in January 2017 and discussed their respective company's clinical

development programs.   Shortly thereafter, Company C informed Defendant Stonehouse that Company C was not interested in pursuing a transaction with BCRX, and there were no further discussions between Company C and BCRX following that meeting.

48.     In January 2017, Defendant Stonehouse attended an industry conference and had informal meetings with representatives of several biopharmaceutical companies, including the CEO of a private biopharmaceutical company ("Company D").  Defendant Stonehouse met again with the CEO of Company D on February 13, 2017 and discussed their mutual interest in exploring a strategic combination.

49.     On February 27, 2017, BCRX announced positive results from an interim analysis of its Phase 2 APeX-1 clinical trial for BCX- 7353 in hereditary angioedema.

50.     In February 2017, following the announcement of the interim results of the Phase 2 APeX-1 clinical trial for BCX-7353, representatives of a mid-size publicly traded biopharmaceutical company ("Company E") contacted Defendant Stonehouse and indicated Company E's interest in exploring a potential business combination transaction with BCRX.

51.     Also, in February 2017, in a discussion with an investment banker, IDRA became aware of a privately held rare disease company ("Company F") that was considering its strategic alternatives, including a possible sale of Company F.  After a discussion at the March 7, 2017 regularly scheduled IDRA board meeting, the IDRA board requested that Mr. Milano follow up on this possible acquisition opportunity.

52.     On May 9, 2017, BCRX and Company E entered into a non-disclosure agreement. Throughout the summer of 2017, Company E conducted a due diligence review of BCRX, and members of Company E management and Defendant Stonehouse engaged in preliminary

discussions regarding possible terms of a potential strategic transaction, including a stock-for-stock merger transaction.

53.     During the months of May and June 2017, IDRA management, along with the IDRA board, had a series of informational meetings to discuss a possible merger agreement with Company F.  Shortly thereafter, Company F informed Mr. Milano that Company F was pursuing a different strategic alternative and would not continue to pursue a transaction with IDRA.

54.     In August 2017, the chairman of Company D called Defendant Stonehouse and informed him that Company D remained interested in discussing a transaction with BCRX.

55.     On September 5, 2017, BCRX announced the final results from the BCX-7353 Phase 2 trial, which showed a positive treatment effect, and announced plans to meet with the FDA and the European Medicines Agency during the fourth quarter of 2017 to finalize plans for Phase 3 study of BCX-7353.

56.     On September 10, 2017, IDRA announced final results from the dose-selection phase of an ongoing Phase 1/2 trial investigating IMO-2125, which demonstrated positive and encouraging response data in anti-PD-1 refractory melanoma.

57.     On September 12, 2017, a public offering of BCRX common stock priced at $5.15 per share, which resulted in net proceeds to BCRX of $85.8 million.

58.     In mid-September 2017, the CEO of Company A contacted Defendant Stonehouse and indicated that Company A was again interested in exploring a potential business combination transaction with BCRX.  Defendant Stonehouse told the CEO of Company A that he would communicate Company A's renewed interest in a business combination transaction to the BCRX Board.

59.     On September 20, 2017, Mr. Milano and Defendant Stonehouse spoke by telephone and discussed progress in the respective clinical programs of BCRX and IDRA.  On the call, Mr. Milano inquired about Defendant Stonehouse's interest in having a further general discussion about recent biopharmaceutical industry developments and the possibility of a potential business combination between BCRX and IDRA.  Defendant Stonehouse agreed to an in-person discussion, which was thereafter set for September 26, 2017.

60.     On September 22, 2017, the chairman of Company D called Defendant Stonehouse and informed him that Company D was not able to consider further discussions at that time because of other corporate priorities of Company D.

61.     On September 26, 2017, Mr. Milano and Defendant Stonehouse met and discussed the possibility of exploring a potential business combination transaction, given the additional data that was now available from their respective clinical development efforts. Defendant Stonehouse told Mr. Milano that he would discuss the opportunity for a potential business combination between BCRX and IDRA with the BCRX Board.

62.     On October 2, 2017, Company E informed BCRX that it was no longer interested in pursuing a merger or acquisition transaction with BCRX and was only interested in licensing BCX-7353.

63.     The BCRX Board held a regularly scheduled Board meeting on October 11 and 12, 2017.  Defendant Stonehouse informed the BCRX Board of his discussions with Company A and IDRA and the interest that each had indicated in exploring a potential strategic transaction.

64.     On October 13, 2017, Defendant Stonehouse contacted Mr. Milano to inform him that the BCRX Board was interested in exploring a potential business combination with IDRA.

They agreed to proceed with preliminary diligence on the other company's respective lead product candidates.

65.     On October 17, 2017, BCRX entered into a mutual non-disclosure agreement with Company A, which included a standstill provision that is inoperative in circumstances where BCRX enters into a merger agreement with a third party or is the subject of a tender offer, and which does not prohibit Company A from requesting that the BCRX Board waive the restrictions in the standstill provision. Company A and BCRX exchanged confidential information, engaged in management discussions about their respective businesses and conducted due diligence on each other during October and November.

66.     On October 18, 2017, BCRX entered into a mutual non-disclosure agreement with IDRA, which did not include a standstill provision, following which BCRX and IDRA granted the other party and its representatives access to its respective online data room with materials limited to each company's respective lead product candidates. BCRX and IDRA periodically engaged in management discussions about, and conducted preliminary due diligence with respect to, each company's respective lead product candidates during October and November.

67.     On October 26, 2017, members of IDRA and BCRX management and representatives of Goldman, Sachs & Co. LLC ("Goldman Sachs"), financial advisor to IDRA, and J.P. Morgan Securities LLC ("J.P. Morgan") met to discuss the two companies' respective clinical and preclinical development programs.

68.     Beginning on November 13, 2017 and continuing through the signing of the merger agreement, Mr. Milano had periodic discussions with members of the IDRA board to provide updates regarding the status of discussions regarding potential licensing or collaboration arrangements and the exploration of the potential business combination with BCRX.

69.     On November 22, 2017, the CEO of Company A contacted Defendant Stonehouse to discuss Company A's continued interest in pursuing a stock-for-stock business combination transaction with BCRX, as well as the status of the due diligence review being conducted by Company A and BCRX.

70.     On November 28, 2017, the IDRA board held a regularly scheduled in-person meeting, with members of IDRA management and, for the portion of the meeting regarding the potential business combination, representatives of Goldman Sachs in attendance.   At the meeting, Mr. Milano provided an update on the discussions with BCRX regarding the potential business combination between BCRX and IDRA.   At this meeting, members of IDRA management reviewed IDRA's due diligence to date on BCX-7353, the commercial potential of BCX-7353, and the capital structure and funding requirements, including the potential for raising capital through partnering arrangements.   Representatives of Goldman Sachs presented public market perspectives on BCRX.   The IDRA board discussed the results of the due diligence review and the strategic rationale for a combination with BCRX.   The IDRA board determined that a potential business combination transaction with BCRX, on the right terms, could be attractive to IDRA and its stockholders. The IDRA board instructed IDRA management to continue its diligence and valuation work on BCRX.

71.     Subsequently on November 28, 2017, Mr. Milano contacted Defendant Stonehouse to discuss the status of the parties' mutual due diligence review, and IDRA's continued interest in the possibility of a potential stock-for-stock business combination transaction with BCRX.

72.     On December 6, 2017, the BCRX Board held a special meeting.   Also, in attendance were members of BCRX management, representatives of J.P. Morgan and

representatives of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), legal advisor to BCRX. Defendant Stonehouse updated the BCRX Board on discussions with each of Company A and IDRA, including discussions between representatives of J.P. Morgan and representatives of Company A with respect to Company A's views on the relative values of BCRX and Company A, and his discussions with Mr. Milano on the methodology for determining the relative values of BCRX and IDRA, and the corporate governance of a combined BCRX/IDRA entity.

73.     On December 6, 2017, at the instruction of the BCRX Board, Defendant Stonehouse called Company A and informed Company A of the BCRX Board's determination that due diligence and preliminary valuation work on Company A did not support the valuation levels that Company A had previously indicated it would require in a business combination transaction with BCRX, and that the BCRX Board determined not to further pursue a transaction with Company A at that time. Defendant Stonehouse also called Mr. Milano and informed him of the BCRX Board's interest in pursuing further discussions and due diligence to determine whether an agreement could be reached with respect to a business combination between IDRA and BCRX.

74.     On December 13, 2017, members of IDRA and BCRX management and representatives of Goldman Sachs and J.P. Morgan held an in-person meeting to discuss each company's respective commercialization plans for its product candidates, status of financial due diligence, and IDRA and BCRX management's respective views on future performance.

75.     During the month of December 2017 and continuing into January 2018, management of BCRX and IDRA, together with their legal and financial advisors, continued their mutual diligence review and participated in meetings and telephonic conferences where

financial, commercial, regulatory, R&D, tax, human resource, chemistry/manufacturing/control ("CMC"), legal and corporate information was exchanged by the parties.

76.    On December 15, 2017, the IDRA board met with members of IDRA management and representatives of Goldman Sachs and Latham & Watkins LLP ("Latham"), legal advisor to IDRA, in attendance.  At the meeting, representatives of Latham provided an overview of the duties of the IDRA board in evaluating a potential business combination with BCRX.

77.    On December 17, 2017, the BCRX Board held a special telephonic meeting, with members of BCRX management and representatives of J.P. Morgan and Skadden in attendance, to discuss the process for evaluating a potential business combination with IDRA and to receive an update from BCRX management on BCRX's ongoing diligence with respect to IDRA.

78.    On December 20, 2017, the BCRX Board held a special telephonic meeting, with members of BCRX management and representatives of J.P. Morgan and Skadden in attendance.

79.    On December 22, 2017, Mr. Milano and Defendant Stonehouse spoke by telephone and discussed the status of the mutual due diligence review.

80.    On December 22, 2017, BCRX and IDRA exchanged their respective management's unadjusted financial forecasts.

81.    On December 28, 2017, the BCRX Board held a special telephonic meeting, with members of BCRX management and representatives of J.P. Morgan, Skadden and Ernst & Young LLP ("E&Y"), BCRX's public accounting firm, in attendance.  At the meeting, management of BCRX reviewed the results of the due diligence review of IDRA.

82.    On December 29, 2017, representatives of Goldman Sachs and J.P. Morgan spoke to discuss the potential respective ownership by BCRX stockholders and IDRA stockholders of

the combined company following the potential business combination.   Representatives of Goldman Sachs indicated that IDRA believed the parties needed to further discuss the relative values of the two companies.   Representatives of J.P. Morgan indicated that BCRX believed BCRX stockholder ownership in the combined company should be greater than 50% on a fully diluted basis.

83.     On January 11, 2018, Defendant Stonehouse and Mr. Milano, together with members of BCRX management, IDRA management and representatives of J.P. Morgan and Goldman Sachs, met to discuss the financial forecasts of the companies' that the respective managements exchanged.   Following the meeting, Defendant Stonehouse and Mr. Milano met separately to discuss the appropriate exchange ratio for the potential business combination between the two companies.

84.     On January 13, 2018, Defendant Stonehouse and Mr. Milano spoke again by telephone to continue their discussion around the appropriate exchange ratio for the potential business combination.

85.     On January 14, 2018, the BCRX Board had a special telephonic meeting, with members of BCRX management and representatives of J.P. Morgan and Skadden in attendance. At the meeting, Defendant Stonehouse updated the BCRX Board on the status of negotiations with IDRA, and IDRA's position regarding the exchange ratio.   At the meeting, representatives of J.P. Morgan presented their preliminary analysis with respect to the relative values of BCRX and IDRA based on the latest available financial forecasts of BCRX and IDRA prepared by BCRX management and reviewed with the BCRX Board the recent trading history of the two companies. The BCRX Board discussed the composition of the board of the combined company, and the roles of Mr. Milano, Defendant Stonehouse and Mr. Ingram in the combined company.

18

The BCRX board instructed BCRX management to continue discussions with IDRA management on a business combination transaction, but to inform IDRA that the exchange ratio should reflect the relative intrinsic values of BCRX and IDRA, and that on this basis the BCRX Board believed that this should yield BCRX stockholder ownership in the combined company of 52.0% on a fully diluted basis.

86.     On January 19, 2018, the BCRX Board held a special telephonic meeting, with members of BCRX management and representatives of Skadden in attendance.  Representatives of Skadden updated the BCRX Board on the status of negotiations with IDRA on the terms of the merger agreement and on the status of negotiations with legal counsel to BBA and the terms of the voting and support agreements.

87.     On January 20, 2018, the BCRX Board held a special telephonic meeting, with members of BCRX management and representatives of Skadden and J.P. Morgan in attendance.

88.     Representatives of J.P. Morgan reviewed the recent trading history of BCRX and IDRA.  The BCRX Board instructed Defendant Stonehouse to make a final proposal to IDRA on the IDRA exchange ratio of 0.40 holding company shares for each share of IDRA and a BCRX exchange ratio of 1.0 (to be adjusted as appropriate based on any reduced exchange ratio for BCRX) implying ownership by BCRX stockholders of approximately 51.6% in the new holding company on a fully diluted basis.

89.     On January 21, 2018, the merger agreement and the voting and support agreements were executed by IDRA and BCRX.  The transaction was announced by joint press release on the morning of January 22, 2018.

## SUBSTANTIVE ALLEGATIONS

### The Merger Agreement

90.    Sections 5.4(a) and (c) of the Merger Agreement provides for a "no solicitation" clause that prevents BCRX from soliciting alternative proposals and constrains its ability to negotiate with potential buyers:

(a)    Each of Island [IDRA] and Boat [BCRX] shall immediately cease, and shall cause its respective Subsidiaries and Representatives to immediately cease, any discussions or negotiations with any Person that may be ongoing with respect to a Competing Proposal, or any proposal that would reasonably be expected to lead to a Competing Proposal, and shall request to have returned promptly to Island or Boat, as applicable, any confidential information that has been provided in any such discussions or negotiations.  From the date hereof until the earlier of the Effective Time or the date of termination of this Agreement in accordance with Article 7, each of Island and Boat shall not, and shall cause its respective Subsidiaries and Representatives not to, directly or indirectly, (i) solicit, initiate or knowingly encourage or induce (including by way of furnishing information), or take any other action designed to facilitate, any inquiries or the making of any proposal which constitutes, or would reasonably be expected to lead to, any Competing Proposal, or (ii) engage in any discussions or negotiations regarding any Competing Proposal; provided, however, that (x) such party may ascertain facts from the Person making an unsolicited Competing Proposal for the sole purpose of
the Island Board or the Boat Board, as applicable, informing itself about the terms of such Competing Proposal and the Person that made it and (y) if, prior to obtaining the Island Stockholder Approval (in the case of Island) or the Boat Stockholder Approval (in the case of Boat) and following the receipt of a bona fide written Competing Proposal made after the date hereof that the Island Board or Boat Board, as applicable, determines in good faith (after receiving advice of its financial advisor and of its outside legal counsel) is or would reasonably be expected to lead to a Superior Proposal and that was not, directly or indirectly, solicited, initiated or knowingly encouraged in violation of this Section 5.4, the Island Board or the Boat Board, as applicable, determines in good faith, after consultation with outside legal counsel, that a failure to take action with respect to such Competing Proposal, as applicable, would constitute a breach of its fiduciary duties under applicable Law, Island or Boat may, in response to such Competing Proposal, as applicable, and subject to compliance with Section 5.4(c), (A) furnish information with respect to Island or Boat, as applicable, to the Person making such Competing

Proposal pursuant to an Acceptable Confidentiality Agreement, and (B) engage in discussions or negotiations with such Person regarding such Competing Proposal. Except as expressly permitted by this Section 5.4, each of Boat and Island shall not, and shall cause their respective Subsidiaries and Representatives not to, from and after the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Article 7, directly or indirectly (1) approve, endorse, recommend or enter into, or publicly propose to approve, endorse, recommend or enter into, any letter of intent, memorandum of understanding, agreement in principle, acquisition agreement, merger agreement or similar definitive agreement (other than an Acceptable Confidentiality Agreement) with respect to any Competing Proposal; (2) take any action to make the provisions of any takeover statute inapplicable to any transactions contemplated by a Competing Proposal; or (3) terminate, amend, release, modify or knowingly fail to enforce any provision of, or grant any permission, waiver or request under, any standstill, confidentiality or similar agreement entered into by the applicable party in respect of or in contemplation of a Competing Proposal (other than to the extent the Boat Board or the Island Board, as applicable, determines in good faith after consultation with its outside legal counsel, that failure to take any of such actions under clause (3) would be constitute a breach of its fiduciary duties under applicable Law), or (4) propose to do any of the foregoing.  For the avoidance of doubt, nothing in this Section 5.4(a) shall relieve any party from its obligations under Section 5.6.

(c)      In addition to the obligations of Boat and Island set forth in Section 5.4(a) and Section 5.4(b), Boat or Island shall promptly, and in any event no later than 24 hours, after it receives (i) any Competing Proposal or indication by any Person that is considering making a Competing Proposal, (ii) any request for non-public information relating to Boat or Island or their respective Subsidiaries, other than requests for information that would not reasonably be expected to result in a Competing Proposal, or (iii) any inquiry or request for discussions or negotiations regarding any Competing Proposal, notify the other party orally and in writing of any of the foregoing occurrences, the identity of the person making such request, inquiry or Competing Proposal and a copy of such request, inquiry or Competing Proposal (or where no such copy is available, a reasonably detailed description of such request, inquiry or Competing Proposal). Each party shall keep the other party reasonably informed (orally and in writing) on a current basis (and in any event at the other party's request and otherwise no later than 24 hours after the occurrence of

any material changes, developments, discussions or negotiations) of the status of any request, inquiry or Competing Proposal (including the terms and conditions thereof and of any modification thereto), and any material developments, discussions and negotiations, including furnishing copies of any written inquiries, material correspondence and draft documentation, and written summaries of any material oral inquiries or discussions. Without limiting the foregoing, each party shall promptly (and in any event within 24 hours) notify the other party orally and in writing if it determines to begin providing information or to engage in discussions or negotiations concerning a Competing Proposal pursuant to this Section 5.4. Each of Boat and Island agrees that, subject to applicable restrictions under applicable Law, it shall, prior to or concurrent with the time it is provided to any third parties, provide to the other party any non-public information concerning Boat or Island and their respective Subsidiaries that Boat or Island provided to any third party in connection with any Competing Proposal which was not previously provided to the other party.

91.    Section 5.4(b) of the Merger Agreement provides that the Company must advise

IDRA of any proposals received from other parties:

Notwithstanding any other provision of this Agreement, including Section 5.3 but subject to compliance with this Section 5.4, prior to receipt of the Island Stockholder Approval, the Island Board may, or, prior to receipt of the Boat Stockholder Approval, the Boat Board may, in response to any bona fide written Competing Proposal that was not, directly or indirectly, solicited, initiated or knowingly encouraged in violation of this Section 5.4, effect an Island Adverse Recommendation Change or a Boat Adverse Recommendation Change, as applicable, if and only if (i) the Island Board or the Boat Board, as applicable, concludes in good faith, after consultation with Island's or Boat's outside financial advisors and outside legal counsel, that such Competing Proposal constitutes a Superior Proposal; (ii) the Boat Board or the Island Board, as applicable, provides the other party four (4) Business Days prior written notice of its intention to take such action (a "Competing Proposal Notice"), which notice shall include the information with respect to such Competing Proposal that is specified in Section 5.4(c), as well as a copy of such Competing Proposal (it being agreed that neither the delivery of such notice by a party nor any public announcement thereof that such party determines it is required to make under applicable Law shall constitute an Island Adverse Recommendation Change or a Boat

22

Adverse Recommendation Change, as applicable, unless and until such party shall have failed at or prior to the end of the period referred to in clause (iii) below (and, upon the occurrence of such failure, such notice and such public announcement shall constitute an Island Adverse Recommendation Change or a Boat Adverse Recommendation Change, as applicable) to publicly announce that it (A) is recommending the Transactions and (B) has determined that such other Competing Proposal (taking into account (x) any modifications or adjustments made to the Transactions agreed to by the other party in writing and (y) any modifications or adjustments made to such other Competing Proposal) is not a Superior Proposal and has publicly rejected such Competing Proposal); (iii) during the four (4) Business Days following such written notice (the "Negotiation Period"), if requested by the other party, the Board of Directors effecting the recommendation change and its Representatives have negotiated in good faith with the other party regarding any revisions to the terms of the Transactions proposed by the other party in response to such Competing Proposal; and (iv) at the end of the four (4) Business Day period described in the foregoing clause (iii), the Island Board or Boat Board, as applicable, concludes in good faith, after consultation with Island's or Boat's outside legal counsel and financial advisors (and taking into account any adjustment or modification of the terms of this Agreement to which the other party has agreed in writing to make to the terms of the Transactions), that the Competing Proposal continues to be a Superior Proposal and, after consultation with Island's or Boat's outside legal counsel, that the failure to make an Island Adverse Recommendation Change or Boat Adverse Recommendation Change, as applicable, would constitute a breach of the fiduciary duties of the Island Board or Boat Board under applicable Law. Any material amendment or modification to any Competing Proposal shall require a new Competing Proposal Notice and the Negotiation Period shall be extended by an additional two (2) Business Days from the date of receipt of such new Competing Proposal Notice.

92.     In addition, there is also a $25 million "termination fee", payable by Merger Sub B to Merger Sub A if the Merger Agreement is terminated.  In short, the above deal protection devices have locked up the Proposed Mergers and have precluded other bidders from making competing offers for the Company.

**CONSIDERATION FOR BCRX SHAREHOLDERS IS INADEQUATE**

93.     The consideration paid to the Company's shareholders is inadequate.  That is, the intrinsic value of the Company is more than the amount offered in the Proposed Mergers.  For example, the merger consideration does not sufficiently compensate BCRX's shareholders for:

(a)     BCRX's lead product, BCX-7353, alone has a present value of well over $1.5 billion, more than three times the current market capitalization of BCRX;

(b)     BCRX has a proven ability to develop products through FDA approval, as evidenced by FDA's approval of the Company's Peramavir in 2014 to treat patients with acute uncomplicated influenza (the flu);

(c)     In addition to its lead asset BCX-7353, BCRX also has a valuable pipeline with a liquid formulation of BCX-7353 currently in a Phase 2 trial called "ZENITH-1", and new programs coming on line, such as the small molecule addressing Fibrodysplasia Ossificans Progressiva ("FOP"); and

(d)     With its recent disclosure of a potential $20 million-plus Peramavir procurement contract from the U.S. government, BCRX has more than sufficient cash on hand to sustain operations into 2020, certainly through the significant upcoming milestones of Phase 3 BCX-7353 data, Phase 2 ZENITH-1 data, and Phase 1 data for FOP.

94.     BCRX shareholders are expected to own 52% of the combined company ("Holdco") and IDRA 48%.  The deal is being sold as a "merger of equals."  For a number of reasons, however, it appears IDRA has a higher risk profile and may be worth less relative to BCRX.

95.     Neither company has commercial products, thus neither generates commercial cash flow. However, it appears BCRX's products are closer to commercialization, thus it is less

risky.  Also, BCRX has proven ability to develop products through FDA approval as evidenced by 2014 approval of Peramavir.

96.    BCRX has more cash on hand ($155m) to fund Research & Development ("R&D") than IDRA does (~$110m).

97.    BCRX is followed by analysts including:  J.P. Morgan, Piper Jaffray, Bank of America ("BoA"), RBC, Jefferies and Barclays.  IDRA does not have a solid analyst following.

98.    IDRA is also less liquid/less widely held because it has traded between $1 and $2 per share over prior 52 weeks, more of a "penny stock."  In fact, its most recent public offering of common stock in October 2017 was priced at $1.50 per share.

99.    Average daily dollar value traded over prior 52 weeks leading up to deal announcement ~$9 million for BCRX as compared to $3 million for IDRA.

100.    J.P. Morgan prepared a Discounted Cash Flow Analyses ("DCF") analysis which resulted in implied value for BCRX of $10.27 - $13.37 per share; and IDRA of $4.21 - $5.52 per share.  The implied exchange ratio for IDRA shares under this scenario is 0.157 - 0.269, compared to the actual of 0.20.  Thus, the DCF analysis supports the deal's exchange ratio and the percentage ownership by each of Holdco.  However, J.P. Morgan used the same discount rate range of 12-15% for both companies.  This despite an apparent discrepancy in risk profile.

101.    J.P. Morgan also prepared an analysis of the value creation to BCRX by combining the companies, based on its mid-point valuation of both BCRX and IDRA.  It adds estimated synergies and deducts the cost of the transaction and net operating loss ("NOL") tax benefits it cannot use.  It then multiplies that value by 52% to derive value to BCRX of $1.315 billion which is 6% higher than the calculated stand-alone value of $1.236 billion.  This analysis

hinges on two large assumptions.  First, the mid-point values for IDRA and BCRX are calculated using the same discount rate of 13.5%.  Second, it includes estimated synergies of $155 million.

102.    BCRX shareholders are giving up about 48% of their direct ownership interest in BCRX and being forced to accept a much riskier asset, IDRA, for that 48%.  Moreover, there is no known market for Holdco shares.

## FALSE AND MISLEADING REGISTRATION STATEMENT

103.    In connection with the Proposed Mergers, a Registration Statement was filed with the SEC.  The Registration Statement fails to provide material information regarding the Proposed Mergers on several important subjects.

104.    The *Financial Forecasts Related to [IDRA]* on pages 77-78 of the Registration Statement do not provide material information to shareholders necessary to form a reasoned opinion as to the advisability of the Proposed Mergers, to wit, it does not contain any disclosure setting forth the free cash flow on each IDRA product candidates (and indications) on an individual product or indication basis.

105.    Yet, in Goldman Sachs' *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis for [IDRA]* on page 87 of the Registration Statement, Goldman Sachs purported to use "probability of success ('POS'), adjusted estimates of the free cash flows to be generated from each indication for IMO-2125 . . . and from each of IMO-8400 and the nucleic acid chemistry compound […]."

106.    These "adjusted estimates of the free cash flows" have been omitted from the Registration Statement and must be provided to shareholders to make the Registration Statement not misleading.

107.    The *Financial Forecasts Related to [IDRA]* on pages 77-78 of the Registration Statement do not provide material information to shareholders necessary to form a reasoned opinion as to the advisability of the Proposed Mergers, to wit, it does not contain any disclosure setting forth the estimates of the corporate costs of IDRA which were not allocated to specific products.

108.    Yet, in Goldman Sachs' *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis for [IDRA]* on page 87 of the Registration Statement, Goldman Sachs purported to use "estimates of corporate costs of [IDRA] reflected in the [IDRA] Projections that had not been allocated to specific products, including clinical costs, research costs, and selling, general and administrative expenses […]."

109.    These "estimates of corporate costs" have been omitted from the Registration Statement and must be provided to shareholders to make the Registration Statement not misleading.

110.    The *Financial Forecasts Related to [IDRA]* on pages 77-78 of the Registration Statement do not provide material information to shareholders necessary to form a reasoned opinion as to the advisability of the Proposed Mergers, to wit, it does not contain any disclosure setting forth the amount of cash [IDRA] had on hand as of December 31, 2017.

111.    Yet, in Goldman Sachs' *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis for [IDRA]* on page 87 of the Registration Statement, Goldman Sachs purported to use a calculation of "[IDRA's] cash as of December 31, 2017, as provided by [IDRA] management […]."

112.    That calculation of "[IDRA's] cash as of December 31, 2017, as provided by [IDRA] management" has been omitted from the Registration Statement and must be provided to shareholders to make the Registration Statement not misleading.

113.    The *Financial Forecasts Related to [BCRX]* on pages 78-79 of the Registration Statement do not provide material information to shareholders necessary to form a reasoned opinion as to the advisability of the Proposed Mergers, to wit, it does not contain any disclosure setting forth the free cash flow on each BCRX product candidate on an individual product candidate basis.

114.    Yet, in Goldman Sachs' *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis for [BCRX]* on pages 88-89 of the Registration Statement, Goldman Sachs purported to use "POS-adjusted estimates of the free cash flows to be generated from each HAE product candidate referred to above and from each of Galidesivir, RAPIVAB, FOP and other development candidate […]."

115.    These "adjusted estimates of the free cash flows" have been omitted from the Registration Statement and must be provided to shareholders to make the Registration Statement not misleading.

116.    The *Financial Forecasts Related to [BCRX]* on pages 78-79 of the Registration Statement do not provide material information to shareholders necessary to form a reasoned opinion as to the advisability of the Proposed Mergers, to wit, it does not contain any disclosure setting forth the estimates of the corporate costs of BCRX which were not allocated to specific products.

117.    Yet, in Goldman Sachs' *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis for BCRX* on page 89 of the Registration Statement, Goldman Sachs purported to use

"estimates of corporate costs of [BCRX] reflected in the [IDRA] Projections that had not been allocated to specific products, including research and development, sales and management, and general and administrative expenses […]."

118.    These "estimates of corporate costs" have been omitted from the Registration Statement and must be provided to shareholders to make the Registration Statement not misleading.

119.    The *Financial Forecasts Related to [BCRX]* on page 78-79 of the Registration Statement do not provide material information to shareholders necessary to form a reasoned opinion as to the advisability of the Proposed Mergers, to wit, it does not contain any disclosure setting forth the amount of cash BCRX had on hand as of December 31, 2017.

120.    Yet, in Goldman Sachs' *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis for [BCRX]* on page 89 of the Registration Statement, Goldman Sachs purported to use a calculation of "[BCRX's] net cash as of December 31, 2017, as provided by [BCRX] management […]."

121.    That calculation of "[BCRX's] net cash as of December 31, 2017, as provided by [BCRX] management" has been omitted from the Registration Statement and must be provided to shareholders to make the Registration Statement not misleading.

122.    In Goldman Sachs' *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis for Holdco* on pages 89-90 of the Registration Statement, Goldman Sachs purported to derive a range of illustrative equity values for Holdco, by, among other things, calculating "an illustrative present value, as of December 31, 2017, of the benefits to be derived by Holdco from its utilization of its net operating losses as reflected in the NOL Forecasts […]."

123.    Yet, Goldman Sachs does not reveal its analysis of what percentage of the net operating losses of IDRA and the net operating losses of BCRX, when combined together into Holdco, will not be able to be used by Holdco in the future.

124.    In contrast, J.P. Morgan, when it was purporting to give an analysis of the implied equity value of BCRX stock on a "standalone basis" versus as part of the "combined company" at page 98 of the Registration Statement, set forth its analysis that there would be a "loss of value due to limitations on tax deductible NOLs as estimated by the management of [BCRX] of approximately $18 million […]."

125.    Analyses by Goldman Sachs of the loss of value due to limitation on tax deductible NOLs as to IDRA and BCRX and an analysis by J.P. Morgan of the loss of value due to limitation on tax deductible NOLs as to IDRA have been omitted from the Registration Statement and must be provided to shareholders to make the Registration Statement not misleading.

126.    In Goldman Sachs' *Illustrative Sum-of-the-Parts Discounted Cash Flow Analysis for Holdco* on pages 89-90 of the Registration Statement, Goldman Sachs purported to derive a range of illustrative equity values for Holdco, by, among other things, calculating "Holdco's pro forma net cash, as of December 31, 2017, as provided by [IDRA] and [BCRX] managements […]."

127.    Yet, Goldman Sachs does not reveal whether its calculation of what Holdco's pro forma net cash position is expected to be based on data provided by the managements of IDRA and BCRX includes and reflects the cost of the Proposed Mergers.

128.    Whether this Goldman Sachs analysis of "Holdco's pro forma net cash, as of December 31, 2017" includes the cost of the Proposed Mergers or not has been omitted from the

Registration Statement and must be provided to shareholders to make the Registration Statement

not misleading.

## CLAIMS FOR RELIEF

### COUNT I

**Class Claims Against All Defendants for Violations of Section 14(a)
of the Exchange Act And SEC Rule 14a-9 Promulgated Thereunder**

129.   Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

130.   SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of

the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of
> any proxy statement, form of proxy, notice of meeting or other
> communication, written or oral, containing any statement which, at
> the time and in light of the circumstances under which it is made,
> is false or misleading with respect to any material fact, or which
> omits to state any material fact necessary in order to make the
> statements therein not false or misleading or necessary to correct
> any statement in any earlier communication with respect to the
> solicitation of a proxy for the same meeting or subject matter
> which has become false or misleading.

131.   Defendants disseminated the false and misleading Registration Statement

specified above, which failed to disclose material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading in violation of

Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

132.   Defendants were aware of this information and of their duty to disclose this

information in the Registration Statement.  The Registration Statement was prepared, reviewed,

and/or disseminated by Defendants.  The Registration Statement misrepresented and/or omitted

material facts as described above.  Defendants were at least negligent in filing the Registration

Statement with these materially false and misleading statements.

133.    The omissions and false and misleading statements in the Registration Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Mergers.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Registration Statement and in other information reasonably available to unitholders.

134.    By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

135.    Because of the false and misleading statements in the Registration Statement, Plaintiff and the putative Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## COUNT II

### Class Claims Against the Individual Defendants for
### Violation of Section 20(a) of the Exchange Act

136.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

137.    The Individual Defendants acted as controlling persons of BCRX within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of BCRX and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

138.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

139.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same. The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Mergers.  They were, thus, directly involved in the making of this document.

140.    In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Mergers.

141.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

142.    Plaintiff and the putative Class have no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff and the putative Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)    Declaring this action to be a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

(B)    Declaring that the Registration Statement is materially false or misleading;

(C)     Enjoining, preliminarily and permanently, the Proposed Mergers;

(D)     In the event that the Proposed Mergers are consummated before the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the putative Class rescissory damages;

(E)     Directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties.

(F)     Awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(G)     Granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 6, 2018

**O'KELLY ERNST & JOYCE, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (#4788)
Daniel P. Murray (#5785)
901 N. Market St., Suite 1000
Wilmington, DE 19801
Tel.: (302) 778-4000
Email: rernst@oelegal.com
       dmurray@oelegal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY  10016
Telephone: 212-983-1300
Facsimile: 212-983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff Melvyn Klein***